## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| JOHN CHARLES HAYES, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) Case No. 05-0324-CV-W-ODS-P |
| | ) |
| MICHAEL BOWERSOX, | ) |
| | ) |
| Respondent. | |

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner filed this federal petition for writ of habeas corpus to challenge his 1999 conviction and life sentence for second degree murder, which was entered in the Circuit Court of Newton County, Missouri. Petitioner raises seven (7) grounds for relief, four of which respondent contends are procedurally barred from federal habeas corpus relief because they were not properly presented to the state courts: (1) the trial court erred in giving Instruction No. 5, the verdict director on second degree murder because it fails to conform to Missouri Approved Instruction 313.04 and fails to require that petitioner "knowingly" caused the death of the victim; (2) the prosecutor committed misconduct by introducing the issue of "sudden passion" into the trial through a paragraph in Instruction No. 5 and through Instruction No. 7, which would have allowed the jury to convict of the lesser offense of voluntary manslaughter if it found petitioner was acting as a result of "sudden passion"; (3) the prosecutor's closing argument misdefined the concept of reasonable doubt by using analogies that did not match up with the facts of petitioner's case, thereby allowing petitioner to be convicted of second degree murder; (4) the evidence was insufficient on each and every element of the crime of second degree murder; (5) the trial court plainly erred in allowing

testimony concerning a suicide attempt by petitioner; (6) the evidence was insufficient to establish that the victim's death was not an accident; and (7) trial counsel was ineffective for not renewing an objection to alleged hearsay testimony in the motion for new trial.

### **Procedurally Defaulted Grounds 1-4**

Grounds 1-4 are claims of trial court error or prosecutorial misconduct that were not briefed on direct appeal. See Respondent's Exhibit 11, p. 6. Therefore, Grounds 1-4 were procedurally defaulted in the state courts. Reese v. Delo, 94 F.3d 1177, 1185 (8th Cir. 1996), cert. denied, 520 U.S. 1257 (1997).

"A habeas petitioner is required to pursue all available avenues of relief in the state courts before the federal courts will consider a claim." Sloan v. Delo, 54 F.3d 1371, 1381 (8th Cir. 1995), cert. denied, 516 U.S. 1056 (1996). "If petitioner fails to exhaust state remedies and the court to which he should have presented his claim would now find it procedurally barred, there is a procedural default." Id.

Although petitioner raised a claim that ineffective assistance of counsel caused his procedural default in his Rule 29.15 motion and appeal, ineffective assistance of post-conviction counsel cannot constitute cause for petitioner's default. See Clemmons v. Delo, 124 F.3d 944, 947-48 (8th Cir. 1997), cert. denied, 523 U.S. 1088 (1998). Petitioner failed to address any viable cause for and actual prejudice resulting from his state procedural default in his reply to respondent's response. See Doc. No. 28.

Petitioner also has failed to show that a fundamental miscarriage of justice will result if his defaulted claims are not considered. See Weeks v. Bowersox, 119 F.3d 1342, 1350 (8th Cir. 1997) (petitioner must make a showing of "actual innocence" in order to fit within the fundamental miscarriage of justice exception) (en banc) (citing Schlup v. Delo, 513 U.S. 298 (1995)), cert. denied, 522 U.S. 1093 (1998).

2

Grounds 1- 4 will be denied.

## Summary of Facts

In affirming petitioner's conviction on direct appeal, the Missouri Court of Appeals, Southern District, summarized the facts as follows:

> Viewed in the light most favorable to the verdict, the adduced evidence shows that Stacy [Lynn Fowler, the victim] graduated from Central High School in 1989. In the fall following graduation, she moved in with a friend, Carolyn Shelton, and Shelton's three children. Stacy met [petitioner] through Ms. Shelton and began dating [petitioner]. [Petitioner] eventually moved into the house with Stacy, Ms. Shelton, and Shelton's children.
>
> There was evidence presented that [petitioner] was possessive of Stacy. On June 25, 1990, Stacy and [petitioner] argued in the living room of the Shelton house. The argument concerned Stacy's desire to end the relationship. Ms. Shelton admonished the couple not to argue "in front of the . . . children." Stacy, Ms. Shelton, and one of Ms. Shelton's daughters moved to the front porch. Ms. Shelton testified that [petitioner] then came "flying" through the front window, that "[h]e was very angry," and that he had "his hands outstretched like he was trying to get Stacy." She further testified that "[h]e started [to] threaten that he was going to kill himself," that she had called the police, and that she "had taken Stacy and the kids down to a friend's house. . . ."
>
> Officer Dennis Shook of the Springfield Police Department testified that he had responded to a call concerning a suicide in progress at the Shelton house. When he arrived, he was told by a "female standing there" that [petitioner] was upstairs and that he had cut his wrists. Officer Shook found [petitioner] sitting on the floor in an upstairs closet with the lights out. [Petitioner] was angry and uncooperative with the officer, refused to let the officer see his wrists, stated that his girlfriend had broken up with him and he no longer wanted to live, that he wanted to be left alone. [Petitioner] eventually exited the room and went downstairs with the officer following. [Petitioner] then attempted to leave. Officer Shook stated that the [petitioner's] wrists were cut to the point that he could see "muscles and tendons and stuff like that" and that [petitioner] became even more angry and combative when he was not allowed to leave, to the point

3

of resisting the officers attempts to help him and throwing Officer Shook to the ground and wrestling with him. [Petitioner] was finally transported to a hospital.

Following the incident, Stacy and [petitioner] reconciled for a period of time. [Petitioner] eventually moved back in with Stacy and the Sheltons at a different house [Ms. Shelton testified that she was evicted from the previous house after petitioner jumped through the window]. At trial, Ms. Shelton testified that Stacy again decided to break off the relationship with [petitioner]. As best this Court can discern from the record, on July 21, 1990, Ms. Shelton took Stacy over to the house of the man Ms. Shelton was dating at the time. Ms. Shelton then returned to her house and told [petitioner] to move out. She indicated that Stacy would not be going with him and [petitioner] got "very mad and very angry." Ms. Shelton testified that Stacy found out previous to that evening that she was pregnant with [petitioner's] child and when Ms. Shelton told [petitioner] to move out he said that "if we thought that he was going to stand by and let some other man's d___ be poking his baby's head that we were wrong." [Petitioner] gathered his things and left and Ms. Shelton returned to her boyfriend's house. Ms. Shelton testified that she last saw Stacy alive when Stacy departed her friend's home for a walk later that night.

Ms. Shelton also testified that she became worried about Stacy when Stacy did not return home that night. She filed a missing person report with the police and searched for Stacy at various locations. The day after Stacy's disappearance, [petitioner] gave a note to Ms. Shelton that he claimed Stacy had written and asked him to give to her. Ms. Shelton testified the note was not in Stacy's handwriting. A couple of days later, [petitioner] showed Stacy's mother a letter he claimed Stacy had written which stated that Stacy loved [petitioner], that she was having his baby, and that she "did not want the Fowlers invited to the wedding." Stacy's mother testified that the letter she saw was also not in Stacy's handwriting.

William Moore testified that he worked with [petitioner] at the time of Stacy's disappearance. He testified that he and [petitioner] went to a bar for a drink after work shortly after Stacy's disappearance. At the bar, [petitioner] asked Mr. Moore "how to live if you killed somebody." [Petitioner] then told Mr. Moore "that he got mad at his girlfriend and strangled her and threw her in a cave behind a rock." Mr. Moore testified

4

that in the following weeks [petitioner] had joked that "he couldn't be charged if you can't find a body" and had further told Mr. More that he "went back to look at the body and it was yellow."

Greg Joiner, a friend of [petitioner], testified that about a month or so after [petitioner] told him that [petitioner] and Stacey had broken up, he was out driving around with [petitioner] "having a few beers." At some point during the drive, [petitioner] told Mr. Joiner that "he caught Stacy with a nigger and that he killed her and that he had put her in the cave behind his dad's house." Further, Mr. Joiner testified that a few years later, after [petitioner] had married, that [petitioner] had a child that died at birth. Mr. Joiner testified that [petitioner] had told him at the time of the child's death that he "wanted to have a child, have a boy to keep the Hayes' tradition or name going" because he "didn't know when he was going to get caught and go to jail for" killing Stacy.

Rhonda Hagar testified that she dated [petitioner] for approximately two weeks in August 1990, about a month after Stacy disappeared. Ms. Hagar was a dancer in a strip bar and testified that the first night she met [petitioner] he told her that he was upset because his pregnant girlfriend "Stacy" had left him and was going to Texas and he had tried to repair things with her but she had refused his entreaties. Ms. Hagar further testified that [petitioner] was possessive of her after they started dating; didn't like her going places without him; came to the strip bar almost every night; and got very upset when other men would tip her. Ms. Hagar eventually broke off her relationship with [petitioner] after she wanted to go home one night and [petitioner] did not want her to go. She testified that he "got very upset, started screaming and hollering" and started threatening her by saying, more than once, that she "could end up like his last girlfriend."

On January 1, 1998, Christopher Genovese, a sixteen year-old boy, and a friend, Eric Willoughby, were out exploring in an area near the intersection of Joe Bald road and Peninsula Estates road near Kimberling City in Stone County. Christopher had found sinkholes some time previously and the boys decided to explore them. They had brought along a flashlight and some rope. They entered the largest of the sinkholes which was three to four feet wide at the top and eight or nine feet deep with "rock forms on the walls on one side and the other side . . . just layered rock, real thin layered rock." At the bottom of this sinkhole was a rock ledge, and when the boys looked *under* the ledge they saw what

5

they thought was a round "geode rock." Christopher tried to reach it but it was too far back under the ledge to reach by hand so he and his friend found a forked stick. When Christopher used the stick to flip the object over he saw that it was a human skull. The boys took the skull home and law enforcement officials were notified of their finding.

An investigation and excavation recovered other skeletal remains wrapped in a blue electric blanket as well as a Big Red chewing gum wrapper, a blue zippered vinyl bag, a hair brush, a bottle of Almay makeup, blue mascara, and a pair of tennis shoes (one shoe size seven and the other size seven and a half) [testimony was presented that Stacy's feet were different sizes and she always wore mismatched sized shoes] with blue and white laces on each side. The tennis shoes were tied together. Further, a Central High School class ring from the graduating class of 1989 was found with the initials S.L.F. engraved inside the band. A number of other items were found as well. Witnesses testified that all of the items were either items belonging to Stacy, were almost identical to items Stacy owned, or were products Stacy used and carried with her. An anthropologist presented testimony that the remains were those of a female, probably Caucasian, in her late teens or early twenties.

After Stacy's body was found, investigators contacted [petitioner] to question him. [Petitioner] was told that some remains had been found and that the investigators wanted to talk to him about one of the missing persons whose remains they may have found. [Petitioner], appearing nervous and fidgety, immediately stated that he did not kill Stacy, even though the investigators had not mentioned her name. Over the course of a number of interviews [petitioner] gave conflicting stories concerning when and where he had last seen Stacy, finally stating that "what actually happened" was that he came home one night and Stacy was gone and that he never saw her again. [Petitioner] also informed the investigators that his father owned a cabin near the Joe Bald Recreation area in Stone County. According to trial testimony, the sinkhole where Stacy's body was found was located within 100 to 400 yards of [petitioner's] father's cabin. Mr. Joiner also testified that he had been to the sinkhole with [petitioner] a number of times. Mr. Moore and Mr. Joiner both came forward with the information previously mentioned when they heard that a body had been discovered. Mr. Joiner further testified that he had gone out to the sinkhole at one point to see if [petitioner] had been telling him the truth but that he had not actually gone down in the sinkhole and did not see anything unusual from the rim.

6

State v. Hayes, 15 S.W.3d 779, 782-84 (Mo. Ct. App. 2000)(footnotes omitted)(emphasis in original).

Before the state court findings may be set aside, a federal court must conclude that the state court's findings of fact lack even fair support in the record. Marshall v. Lonberger, 459 U.S. 422, 432 (1983). Credibility determinations are left for the state court to decide. Graham v. Solem, 728 F.2d 1533, 1540 (8th Cir. en banc 1984), cert. denied, 469 U.S. 842 (1984). It is petitioner's burden to establish by clear and convincing evidence that the state court's findings are erroneous. 28 U.S.C. § 2254 (e)(1). Because the state court's findings of fact have fair support in the record and because petitioner has failed to establish by clear and convincing evidence that the state court findings are erroneous, the Court defers to and adopts these factual conclusions.

### Trial Court Error in Allowing Testimony of Petitioner's Attempted Suicide – Ground 5

In Ground 5, petitioner alleges that the trial court erred in allowing testimony that petitioner had attempted suicide when the victim previously had broken up with him. In denying this claim on direct appeal, the Missouri Court of Appeals, Southern District, reviewed the testimony for plain error because no objection had been raised at trial:

> Here, [petitioner] complains that the evidence of his attempted suicide and subsequent scuffle with the police was not legally relevant. The State claims that "the challenged evidence . . . was relevant to show [petitioner's] motive to kill Stacy." The State's theory is that [petitioner's] reaction to Stacy's first attempt at breaking up with [petitioner] is relevant to show "the lengths to which [petitioner] would go to keep [Stacy] in the relationship." We agree. The evidence that [petitioner] had tried to hurt himself inferentially reflects the extreme agitation [petitioner] experienced when confronted by the prospect of Stacy leaving him. It certainly lends strength to the State's argument that when confronted by that prospect a second time, [petitioner's] obsession with Stacy led to her homicide.

7

> Such probative evidence is not outweighed by any prejudice the jury might have against suicidal persons, or even suicidal persons who must be physically restrained by law enforcement in order to be helped. The trial court did not abuse its discretion in determining the probative value of the evidence relating to [petitioner's] ostensible suicide attempt outweighed its prejudicial effect. . . . Even assuming *arguendo* that such evidence was more prejudicial than probative, when considering the other evidence presented at trial, particularly [petitioner's] multiple inculpatory statements, the admission of such evidence would certainly not result in manifest injustice or a miscarriage of justice. . . . [Petitioner's] first point is denied.

State v. Hayes, 15 S.W.3d at 785-86 (footnotes and citations omitted)(emphasis in original).

Where the Missouri Court of Appeals considers a claim for plain error, a federal court also may review that claim for plain error. Thomas v. Bowersox, 208 F.3d 699, 701 (8th Cir. 2000), cert. denied sub nom. Thomas v. Leubbers, 531 U.S. 967 (2000); Mack v. Caspari, 92 F.3d 637, 641 (8th Cir. 1996), cert. denied, 520 U.S. 1109 (1997). Under this standard, a federal court "will grant habeas relief only if 'manifest injustice resulted' from the alleged errors." Mack, 92 F.3d at 641. See also Frey v. Leapley, 931 F.2d 1253, 1255 (8th Cir. 1991) ("the error must amount to 'a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure'") (quoting Hill v. United States, 368 U.S. 424, 428 (1962)). Whether petitioner's Ground 5 is reviewed only for plain error under the line of cases represented by Mack v. Caspari, supra, or is considered on its merits, it will be denied. "An erroneous state-court evidentiary ruling violates the Due Process Clause only if it is 'gross, conspicuously prejudicial or of such import that the trial was fatally infected.'" Richardson v. Bowersox, 188 F.3d 973, 980 (8th Cir. 1999), cert. denied, 529 U.S. 1113 (2000) (quoting Redding v. Minnesota, 881 F.2d 575, 579 (8th Cir. 1989). "In other words, [petitioner] 'must show a reasonable probability that the error affected the trial's outcome.'" Richardson,

8

188 F.3d at 980 (quoting Meadows v. Delo, 99 F.3d 280, 283 (8th Cir. 1996).

State trial courts are afforded wide discretion with evidentiary rulings. "Evidentiary questions are matters of state law that federal habeas corpus courts may review only to determine if the alleged evidentiary error infringed a specific constitutional right or was so prejudicial that it fatally infected a trial's fairness." Murray v. Groose, 106 F.3d 812 (citing Ford v. Armontrout, 916 F.2d 457, 460 (8th Cir. 1990), cert. denied, 499 U.S. 964 (1991)). "[T]here is no due process violation simply because a trial court admits evidence of a defendant's uncharged bad acts." Harris v. Bowersox, 184 F.3d 744, 752 (8th Cir. 1999), cert. denied, 528 U.S. 1097 (2000). In order to claim habeas relief on a claim of improper admission of evidence of uncharged bad acts, a petitioner "must show that the alleged error rendered the entire trial fundamentally unfair — that there is a reasonable probability that. . . absent the alleged impropriety, the verdict probably would have been different." Id.

Evidence that petitioner attempted suicide and refused to go to the hospital when encountered by the police who were called to the scene is no more damaging to his defense than is the uncontested evidence that he jumped through the front window of Ms. Shelton's home in an apparent attempt to "get at" Stacy. The evidence at issue in Ground 5 did not deprive petitioner of a fair trial in that, given the weight of the evidence against petitioner, it is unlikely the verdict would have been different had the evidence not been admitted. The Missouri Court of Appeals' resolution was not based on "an unreasonable determination of the facts in light of the evidence" or a misapplication of "clearly established Federal law." 28 U.S.C. § 2254(d)(1) and (2). See also See Ivy v. Bowersox, 122 F.3d 675, 676 (8th Cir. 1997) (state court's evidentiary ruling warrants federal habeas corpus relief "'only if the alleged error was so conspicuously bad that it fatally infected the trial and rendered it fundamentally unfair'"), cert.

9

denied, 522 U.S. 1121 (1998); McKee v. Nix, 995 F.2d 833, 836 (8th Cir.) (federal habeas corpus relief unavailable unless the state court's interpretation of state law was "'so unexpected, so outlandish, that no reasonable person could have expected it'"), cert. denied, 510 U.S. 998 (1993). Ground 5 will be denied.

## **Insufficiency of Evidence – Ground 6**

In Ground 6, petitioner contends that the evidence was insufficient for conviction because the state did not prove beyond a reasonable doubt that the victim's death was not an accident or suicide without reference to petitioner's statements, which petitioner contends were inadmissible for that purpose in that the *corpus delicti* had not been established. The state appellate court interpreted petitioner's claim to be that his extra-judicial admissions improperly were admitted without independent proof of the *corpus delicti*. State v. Hayes, 15 S.W.3d at 786. In denying that claim, the Missouri Court of Appeals held:

> In the instant matter, Stacy disappeared suddenly. There was evidence presented that Stacy was healthy and happy and had no connection to the area where her body was found except through [petitioner]. Stacy had no driver's license. However, the sinkhole where she was found is approximately one hour's drive from Springfield, Missouri, under normal driving conditions. Evidence was presented that her body was found *underneath* a stone outcropping at the bottom of a sinkhole. Her shoes were found tied together. Her body was wrapped in an electric blanket. Such evidence surpasses the "slight corroborating facts" needed to establish that the death was not the result of accident, suicide or natural causes, thereby allowing [petitioner's] inculpatory statements to be admitted.

State v. Hayes, 15 S.W.3d at 786 (footnotes and citations omitted)(emphasis in original).

Upon a review of the evidence presented at trial, this Court agrees that the prosecution proved

10

beyond a reasonable doubt that the victim's death was not suicide or an accident. A federal court, in reviewing a sufficiency of the evidence claim, must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (constitutional standard for judging sufficiency of the evidence in criminal trials). The fact finder is given latitude "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Jackson v. Virginia, 443 U.S. at 319.

The evidence in this case is sufficient to support petitioner's convictions under the above standards. A rational trier of fact could have found that petitioner the victim's death was not an accident or suicide and that petitioner killed the victim and placed her body in a cave behind his father's house. Petitioner has failed to show that the state courts' decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law" or that their decisions were "based on an unreasonable determination of the facts in light of the evidence presented" at trial. 28 U.S.C. § 2254(d)(1) and (2).

### Ineffective Assistance of Counsel – Ground 7

In Ground 7, petitioner contends that trial counsel was ineffective for not renewing in the motion for new trial his objection to alleged hearsay testimony. In reviewing this ground for relief on appeal from denial of petitioner's post-conviction motion filed pursuant to Mo. Sup. Ct. R. 29.15, the state appellate court held:

> [Petitioner's] counsel premised his objection on the fact that Shelton's statement was hearsay and offered only to show that [petitioner] had a motive to kill Fowler. In overruling the objection, the trial court stated, "Well, she can testify to whatever she heard so long as [Fowler]

11

and [petitioner] were together and that wouldn't be hearsay." Thereafter, [petitioner's] trial counsel failed to renew this objection in his Motion for New Trial. In its Findings of Fact and Conclusions of Law, the motion court held that even if Shelton's statement constituted inadmissible hearsay, [petitioner] was not prejudiced.

> Considering the cumulative evidence of his guilt, we find that the elicited testimony was not prejudicial to [petitioner's] case and had no effect on the trial court's denial of his motion for a new trial. [The state appellate court did not address whether the statement was hearsay.] Here, Shelton was not the only witness to testify about the break-up between [petitioner] and Fowler. The officer who responded to Shelton's home after the argument testified that [petitioner] himself stated that his girlfriend had broken up with him. Additionally, Rhonda Hagar, another girlfriend of [petitioner's] testified that [petitioner] informed her that his pregnant girlfriend had left him. After Fowler's body was found, [petitioner] told the police that Fowler had broken up with him. Whether Fowler wanted to break up with [petitioner] was simply not a contested issue according to the testimony of [petitioner] himself and the police officers who responded to Shelton's call on the day of the argument. Shelton's observation in no way prejudiced [petitioner]. Based on the foregoing, we are unable to conclude that there is a reasonable probability that, but for trial counsel's failure to renew the objection to the testimony in the Motion for New Trial, the trial court's ruling would have been different.
>
> [Petitioner] has failed to overcome the prejudice prong of the *Strickland* test; thus, the motion court's findings of fact and conclusions of law are not clearly erroneous. The judgment denying [petitioner's] Rule 29.15 motion is affirmed.

Hayes v. State, 135 S.W. 3d 471, 473-74 (Mo. Ct. App. 2004)(footnotes and citations omitted).

In order to succeed on an ineffective assistance of counsel claim, petitioner must establish that: (1) his counsel's performance was unreasonable as viewed in the totality of the circumstances; and (2) counsel's deficient performance prejudiced petitioner's defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). Reasonably effective assistance of counsel may be defined as the skill and diligence that a

12

reasonably competent attorney would exercise under similar circumstances. See, e.g., id. at 687-90. Judicial scrutiny of counsel's performance must be highly deferential, id. at 689, and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id.

Petitioner has failed to demonstrate that counsel's failure to renew the objection in the motion for new trial prejudiced his defense. In order to demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. There is little likelihood the outcome of petitioner's case would have been different had counsel renewed the objection to Shelton's testimony about the break-up between petitioner and the victim because several other witnesses testified as to the same thing. Ground 7 will be denied.

Accordingly, it is **ORDERED** that the petitioner for writ of habeas corpus is denied, and this case is dismissed with prejudice.

/s/ Ortrie D. Smith
ORTRIE D. SMITH
UNITED STATES DISTRICT JUDGE

Kansas City, Missouri,
Dated:   9/21/05   .